**Case Nos. 15-4028, 15-4029**

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

WINDSOR SECURITIES, LLC, a
Nevada limited liability company,
*Intervenor-Defendant/Appellant*
v.
PHL VARIABLE INSURANCE
COMPANY, *Plaintiff/Appellee.*


THE SHELDON HATHAWAY
FAMILY INSURANCE TRUST, by
and through its trustee, DAVID
HATHAWAY, *Defendant/Appellant*
v.
PHL VARIABLE INSURANCE
COMPANY, *Plaintiff/Appellee.*

Appeal from the United States
District Court for the District of Utah,
The Honorable Robert J. Shelby
Civil Case No. 2:10cv-67-RJS

---

### CORRECTED BRIEF OF APPELLANTS

---

R. Willis Orton
Alexander Dushku
R. Shawn Gunnarson
Shawn T. Richards
KIRTON | McCONKIE
60 East South Temple, Suite 1800
Salt Lake City, UT  84111
(801) 328-3600
*Attorneys for Appellants*

David W. Scofield
PETERS|SCOFIELD
7430 Creek Road, Suite 303
Sandy, Utah 84093
(801)322-2002

**Oral Argument Requested**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Windsor Securities, LLC is wholly owned by Windsor Irrevocable Trust but issues no publicly-traded stock.

The Sheldon Hathaway Family Insurance Trust has no parent corporation and issues no publicly-traded stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ....................................................................................2

INTRODUCTION ...................................................................................................3

STATEMENT OF THE CASE................................................................................6

    A.       Statement of Facts ..................................................................................6

    B.       Relevant Procedural History ................................................................18

    C.       The District Court's Decision ..............................................................19

SUMMARY OF ARGUMENT ..............................................................................20

ARGUMENT ..........................................................................................................22

    I.       PHL Waived Any Right to Rescind the Hathaway Policy ....................23

    A.      PHL breached its statutory duty to notify Hathaway of its intent to rescind the Policy within the 60-day deadline ........................................23

    B.      PHL also impliedly waived its right to rescind the Hathaway Policy through its course of conduct ................................................................30

        1.    PHL waived its right to rescind by accepting premiums after learning of the inaccuracies in the Application ..................................................30

        2.    PHL waived its right to rescind by failing to exercise that right promptly after learning of the misstatements ......................................31

    C.      PHL waived its right to rescind the Hathaway Policy when the misstatements were known by, and likely produced by, its own agents 32

    II.      Viewing the Facts in the Light Most Favorable to Appellants, the District Court Erred in Ruling That Utah Law Allows PHL to Rescind the Policy 36

    A.      The Utah Code expressly limits the right to rescind an insurance agreement for misrepresentation ...........................................................37

B.    The district court erroneously brushed aside genuine issues of material fact regarding PHL's right of rescission ..................................................40

1.    There is at least a genuine dispute whether Hathaway or the Trustee had sufficient knowledge regarding inaccuracies in the Application to constitute a "misrepresentation...........................................................40

a.    The knowledge standard for proving misrepresentation .....................40

b.    Hathaway and the Trustee lacked knowledge of the misstatements ....43

2.    The district court failed to provide an evidentiary basis and analysis for its ruling regarding reliance; a proper analysis refutes the existence of reliance or at least establishes a genuine dispute of fact .....................50

III.    PHL Has No Legal Right to Retain Premiums Paid Under an Agreement It Rescinded ...........................................................................................54

CONCLUSION ................................................................................................58

STATEMENT ON ORAL ARGUMENT ...........................................................59

CERTIFICATE OF COMPLIANCE ..................................................................60

CERTIFICATE OF ECF COMPLIANCE ..........................................................61

CERTIFICATE OF SERVICE ..........................................................................62

# TABLE OF AUTHORITIES

## CASES

*Andalex Res., Inc. v. Myers*
  871 P.2d 1041 (Utah App. 1994) ........................................................... 39

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................................... 22

*Berger v. Minnesota Mut. Life Ins. Co.*
  723 P.2d 388 (Utah 1986) ........................................................... 38, 39

*ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*
  494 F.3d 1238 (10th Cir. 2007) ................................................... *passim*

*Colosimo v. Roman Catholic Bishop*
  156 P.3d 806 (Utah 2007) ................................................................... 44

*Cont'l Ins. Co. v. Kingston*
  114 P.3d 1158 (Utah App. 2005) ........................................... 30, 31, 52

*Coroles v. State*, No. 20130217
  2015 WL 1788799 (Utah Apr. 21, 2015) ........................................... 35

*Crookston v. Fire Ins. Exch.*
  817 P.2d 789 (Utah 1991) ................................................................... 38

*Derbidge v. Mutual Protective Ins. Co.*
  963 P.2d 788 (Utah App. 1998) ........................................... 38, 39, 40, 41

*Farrington v. Granite State Fire Ins. Co.*
  232 P.2d 754 (Utah 1951) ........................................................ 30, 32, 36

*Faustin v. City and County of Denver*
  423 F.3d 1192 (10th Cir. 2005) ......................................................... 29

*Fid. & Cas. Co. v. Middlemiss*
  135 P.2d 275 (Utah 1943) ................................................................... 51

*First Sec. Bank v. Pan Am. Bank*
   215 F.3d 1147 (10th Cir. 2000) ............................................................ 22

*Gildea v. Guardian Title Co.*
   970 P.2d 1265 (Utah 1998) .................................................................... 35

*Home Sav. and Loan v. Aetna Cas. & Sur. Co.*
   817 P.2d 341 (Utah App. 1991) ............................................................. 52

*Major Oil Corp. v. Equitable Life Assurance Soc'y*
   457 F.2d 596 (10th Cir. 1972) ............................................................... 53

*Marks v. Cont'l Cas. Co.*
   427 P.2d 387 (Utah 1967) ...................................................................... 49

*Moore v. Energy Mut. Ins. Co.*
   814 P.2d 1141 (Utah App. 1991) ........................................................... 39

*O'Dea v. Olea*
   217 P.3d 704 (Utah 2009) ...................................................................... 45

*Posner v. Equity Title Ins. Agency, Inc.*
   222 P.3d 775 (Utah Ct. App. 2009) ....................................................... 35

*Schuhman v. Green River Motel*
   835 P.2d 992 (Utah App. 1992) ............................................................. 38

*Scottsdale Ins. Co. v. Tolliver*, No. 07-5083
   2008 WL 681676 (10th Cir. Mar 11, 2008) .......................................... 39

*Soter's, Inc. v. Deseret Fed. Savings & Loan Assoc.*
   857 P.2d 935 (Utah 1993) ...................................................................... 30

*Theros v. Metropolitan Life Ins. Co.*
   407 P.2d 685 (Utah 1965) ............................................................. *passim*

*U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*
   270 P.3d 464 (Utah 2012) .......................................................... 55, 56, 57

*Vina v. Jefferson Ins. Co.*
  761 P.2d 581 (Utah App. 1988) ...........................................................35

*Wahlcometroflex, Inc. v. Westar Energy, Inc.*
  773 F.3d 223 (10th Cir. 2014) ..............................................................6

*Wankier v. Crown Equip. Corp.*
  353 F.3d 862 (10th Cir. 2003) ............................................................57

*Wolf v. Prudential Ins. Co.*
  50 F.3d 793 (10th Cir. 1995) ..............................................................23

*Zions First Nat'l Bank v. Clark Clinic Corp.*
  762 P.2d 1090 (Utah 1988) .................................................................35

## STATUTES AND RULES

28 U.S.C. § 1332 ......................................................................................1

28 U.S.C. § 1295 ......................................................................................1

28 U.S.C. § 2107 ......................................................................................1

FED. R. CIV. P. 56(c) ...............................................................................22

Utah Code § 31A-1-301 ..................................................................... 33, 34

Utah Code § 31A-21-104 .......................................................................36

Utah Code § 31A-21-105 ............................................................... *passim*

Utah Code § 31A-22-403 .......................................................................32

Wis. Stat. § 631.07(4) ............................................................................37

## OTHER AUTHORITIES

44 AM. JUR. 2D *Insurance* § 920 (2015) ........................................... 55, 56

## STATEMENT OF RELATED CASES

These appeals were consolidated by court order dated April 17, 2015. There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

The district court properly exercised diversity jurisdiction under 28 U.S.C. § 1332. The disputed life insurance Policy and the premiums paid under it each exceed $75,000 in value and the parties are citizens of different states: PHL Variable Insurance Co. is a citizen of Connecticut; the Sheldon Hathaway Family Insurance Trust is a citizen of Utah; and Windsor Securities, LLC is a Nevada limited liability company.

The Court of Appeals has subject matter jurisdiction under 28 U.S.C. § 1295(a)(1) because this appeal is from a final district court order granting summary judgment and "clos[ing] the case" on December 2, 2012 and from its order denying a motion to alter or amend the judgment on February 11, 2015. Copies of both orders are contained in the Attachment to this brief.

Timely notices of appeal were filed by Windsor and the Trust on March 10, 2015. *See* 28 U.S.C. § 2107(a).

## STATEMENT OF ISSUES[1]

1.      An insurer can waive the right to rescind an insurance policy under Utah law by failing to give statutory notice to the insured within 60 days of its intent to rescind, by collecting premiums and acting as if the policy is in force, and by the imputed knowledge or actions of its agents.  Insurer PHL discovered misstatements in the Hathaway insurance Application but failed to notify Hathaway of its intent to rescind the Policy until filing suit 13 months later, all the while collecting six-figure premiums and treating the Policy as fully valid.  PHL's agents, moreover, put the misstatements in the Application.  The issue is whether PHL waived its right to rescind the Policy as a matter of law or, alternatively, whether there are genuine factual disputes regarding waiver.

Waiver was raised in the parties' summary judgment briefing, Aplt. App. S30-38, 683-694, and ruled on by the district court, *id.* 761-766.

2.      To obtain relief under Utah's rescission statute an insurer must prove by clear and convincing evidence that it reasonably relied on a material misstatement that the insured knew or should have known was false.  Hathaway never knew there were misstatements in the blank Application that PHL's agent had him sign because he couldn't read and they were never explained to him, and there is no undisputed evidence demonstrating that he should have known.  The

---

[1] Citations to the Appendix with the letter "S" refer to the sealed Appendix.  Citations to the Appendix without the letter "S" refer to the main Appendix.

same is true of the Trustee. And PHL relied on an investigator that failed even to ask Hathaway about the misstatements. The issue is whether PHL has proven by clear and convincing evidence—or any undisputed evidence—that it reasonably relied on Hathaway's or the Trustee's material misstatements.

This issue was raised in the parties' summary judgment briefing, *see id.* S30-S36, 683-694, and ruled on by the district court, *id*. 759-761.

3.    Long-standing Utah law holds that when an insurer rescinds an insurance contract it must return the premiums. After granting rescission, the district court let PHL keep the six-figure premiums it had collected, including during the 13 months it knew about the misstatements in the Application but failed to act. The issue is whether under Utah law the district court erred in allowing PHL to retain the premiums.

This issue was raised in the parties' summary judgment briefing, *id.* S38-S42, 696-698, and ruled on by the district court, *id.* 767-770.

## **INTRODUCTION**

This appeal challenges the district court's order of summary judgment for PHL, allowing it to rescind a life insurance Policy based on inaccuracies in the Application while keeping $200,000 in premiums. Summary judgment should be reversed for three reasons. First, PHL waived its right of rescission under Utah law by failing to notify the insured, Sheldon Hathaway, of its intention to rescind

3

the Policy within 60 days after discovering the inaccuracies; by continuing to accept premiums after that discovery as if the Policy were in full force; and by the imputed knowledge and actions of its agents who knew about the inaccuracies and, in some instances, were responsible for adding them to the Application. Second, there are genuine factual disputes regarding whether Hathaway and his Trust had the requisite knowledge of the misstatements and whether PHL reasonably relied on the Application's inaccuracies. Third, PHL has no authority under Utah law to retain premiums on an insurance policy it rescinded.

PHL's determination to rescind a life insurance policy its agents sold to an illiterate old man, while pocketing $200,000 in premiums, is legally indefensible. PHL's agents sought out Hathaway and told him that an investor would pay the premiums on the Policy and provide him a substantial financial benefit up front in exchange for the right to any Policy proceeds. That sounded like a good deal to Hathaway, so he agreed and had the Trust established to handle the financial details. Windsor Securities, LLC acted as the investor, paying Hathaway's premiums. As an additional incentive for Windsor, a high-level PHL agent named Giordano agreed to pay Windsor $40,000 after the Policy was issued and the premium paid.

Hathaway signed the blank insurance Application that the insurance agent— a man named Sullivan—gave him. So did the Trustee on behalf of the Trust.

Neither read the Application—in fact, Hathaway couldn't.  Sullivan then sent the signed but blank Application up the PHL-agency ladder for further processing. Hathaway, the Trustee, and Sullivan had no idea that someone else—likely Giordano, whom Sullivan worked for—would insert false information about Hathaway's net worth and about whether the premiums would be financed by a third party and the Policy later sold.  PHL purportedly assigned Infolink, its independent investigator, to verify the information in the Application.  Infolink reported to PHL that everything checked out, but Infolink never actually contacted Hathaway and later destroyed its files.

PHL issued the Hathaway Policy on January 31, 2008.  Windsor loaned the Trust $200,000 to pay premiums on the Policy, and over the next two years PHL paid itself $145,000 from the $200,000 premium deposit.  More than $200,000 in commissions flowed from PHL to its agents, starting with $180,000 to Giordano.

Later in 2008, PHL became suspicious of Giordano and conducted an internal investigation into his business practices.  By December 31, 2008, PHL knew the Application contained misstatements.  But rather than giving notice within 60 days of its intent to deny coverage as required by Utah law, PHL continued to collect premiums for an additional 13 months—right up until January 28, 2010, three days before the two-year statutory contestability period expired— when it filed this action.  With PHL and its agents handsomely profiting off the

arrangement, PHL sought to rescind the Policy and keep the premiums—as a matter of equity.

Neither Utah law nor the undisputed facts supports the district court's ruling. Summary judgment for PHL should be reversed and summary judgment on the waiver and premium-retention issues should be entered for the Trust and Windsor. Or, at least, the persistence of genuine issues of material fact requires reversal and remand for trial.

## STATEMENT OF THE CASE

### A.    Statement of Facts.

As appropriate on appeal from an award of summary judgment, the following statement presents the evidence and any inferences in the light most favorable to appellants. *Wahlcometroflex, Inc. v. Westar Energy, Inc.*, 773 F.3d 223, 226 (10th Cir. 2014).

### Key Actors

This case centers on a life insurance policy ("Policy") issued for Sheldon Hathaway. Aplt. App. S221-S265. Hathaway was 75 years old when the Policy was issued. *Id.* S268-S269. He had worked in blue-collar jobs all his life. *Id.* S269-S270. Significantly, Hathaway was illiterate. *Id.* S273. Hathaway passed away on March 21, 2014. *Id*. 821-822.

PHL Variable Insurance Co. issued the Policy for Hathaway with a death benefit of $4 million on January 31, 2008.  *Id.* 98.  When executed, the Policy was owned by the Sheldon Hathaway Family Insurance Trust, whose trustee is Hathaway's son, David Hathaway (the "Trustee").  *Id.*  The Trust was established to manage Hathaway's financial affairs related to the Policy.  *Id.* S283.

PHL is a wholly owned subsidiary of the Phoenix Companies, Inc., a sophisticated, multi-billion dollar financial services company.  *Id.* S186, 32.  Through contractual arrangements with its agents and brokers, PHL markets financial products, including life insurance.  *Id.* S191-S192, S212.

Among its agents and brokers are Crump Life Insurance Services, Inc. and Gabriel Giordano.  Their contractual and agency relationships with PHL are important to understanding PHL's legal responsibilities toward an insured like Hathaway.

PHL has a longstanding agency relationship with Crump and its corporate predecessor.  Crump is an insurance "wholesaler" that acts as a "go between" for PHL and the retail salespeople that sell its products.  *Id.* S56-S57.  On December 3, 2007, PHL entered into a Brokerage General Agent Agreement (the "Agency Agreement") with Crump.  *Id.* S166-S183.  Crump's extensive duties to PHL under the Agency Agreement included (1) promoting, marketing, and selling PHL products, (2) endorsing PHL products to the retail salespeople contracted by PHL,

(3) facilitating PHL's access to the retail salespeople, and (4) providing PHL's salespeople with promotional and other materials that PHL provides to Crump. *Compare id.* S9-S10 *with id.* 670 (admitting), S166-S183.   Crump was also obligated to recruit, vet, and recommend salespeople for PHL.  *Id.*  Crump, and any salesperson appointed at its recommendation, also agreed to comply with "all marketing and underwriting guidelines of [PHL] applicable to [PHL] Products." *Id.*  PHL obligated Crump to comply with—and to ensure that all salespeople it recommended complied with—PHL's "policies and procedures."  *Id.*  And PHL agreed to compensate Crump based on payments PHL received for insurance contracts procured by PHL-Crump salespeople.  *Id.*

In 2008, when the Hathaway Policy was issued, Gabriel Giordano was an authorized salesperson for PHL and Crump.  *Compare id.* S4-S11 *with id.* 670 (admitting).   PHL, Crump, and Giordano were bound together through an overlapping set of contractual agreements for the purpose of marketing insurance products.  *Id.*  PHL considers Giordano bound by the 2007 PHL-Crump Agency Agreement and, indeed, Giordano was one of Crump's top agents.  *Id.* S56.  Crump and Giordano entered a Top Producer Agreement, signed by Giordano as CEO of PRG Financial Resources, Inc., a company Giordano established as a vehicle through which he and other insurance agents could sell life insurance.  *Compare id.*

S4-S11 *with id.* 670-671 (admitting). From the time of PRG's establishment until at least April 2009, Giordano was head of PRG's operations. *Id.*

Besides being bound by the PHL-Crump Agency Agreement, Giordano entered a contract (the "PHL-Giordano Agreement") directly with PHL allowing him to sell its insurance products. *Compare id.* S6 *with id.* 670 (admitting).

Through this contractual web, Giordano was connected with PHL in at least four ways. First, under the PHL-Giordano Agreement, PHL directly paid Giordano sales commissions for any PHL policy Giordano sold. *Compare id.* S6 *with id.* 670-671 (admitting). Second, under the PHL-Crump Agency Agreement, PHL compensated Crump whenever Giordano sold PHL policies. *Compare id.* S10-11*with* 670 (admitting). Third, under the Top Producer Agreement, Crump paid a portion of its PHL compensation to Giordano. *Id.* S58. And fourth, in addition to compensation, the PHL-Giordano Agreement obligated Giordano to comply with PHL's current "regulations and procedures," together with all other future regulations and procedures issued by PHL. *Id.* S102. PHL retained exclusive ownership of all printed matter, software, supplies, and equipment that it gave Giordano for use in selling its products. *Id*. S102-S103. And PHL retained the right to terminate the Agreement—including the "agency created" thereunder—with or without cause. *Id*. S105-S106.

On December 10, 2007, Giordano was appointed to act on behalf of PHL and Crump for the sale of life insurance products in Utah. *Compare id.* S11-12 *with id.* 671-672 (not denying).

One of the insurance agents soliciting life insurance policies in Utah under the direction of Giordano/PRG was Jay Sullivan. *Id.* S316-S317. Sullivan, a licensed insurance agent in the State of Utah, primarily dealt with a PRG agent named Brock Diediker. *Id.* S299, S320. Sullivan was a "gofer" for PRG, testifying that when PRG gave him instructions, he "just did it." *Id.* S351. Sullivan's motivation was to earn a finder's fee for any insurance contract he could procure for PRG. *Id.* S333. Sullivan understood that PRG (or Giordano) would be the actual writing agent on all life insurance policies that he referred. *Id.* S316-S317.

### The Disputed Application

Sullivan sought out Hathaway as a potential customer for PHL life insurance. *Id.* S271-S273. Hathaway did not independently seek to purchase life insurance. *Id.* Sullivan gave him information about the Policy at issue here and ultimately convinced Hathaway to sign an application for the Policy ("Application"). *Id.* But because he is illiterate, Hathaway could not read the Application and thus did not know what information it contained. *Id.* S273. When signing the Application, Hathaway relied completely on what Sullivan told him

10

about the Policy and its terms.  *Id.* S273, S277.  The only life insurance policy that Hathaway applied for was the PHL Policy disputed here.  *Id*. S271, S290.

Sullivan solicited Hathaway's business using a brochure created by PRG/Giordano.  *Id.* S331, S333.  Sullivan mailed the PRG brochure to Hathaway and then spoke with him about it several times in person.  *Id.* S347.  Although Hathaway was unable to read the Policy, Sullivan described its contents.  *Id*. S336. Among other things, Sullivan explained that the Policy's premiums would be financed by an investor, that after two years that investor would buy the Policy, and that Hathaway would not be charged for any expenses associated with it.  *Id*. S336-S337, S272.  Sullivan explained that Hathaway would earn a profit when the insurance contract was sold to the investor.  *Id*. S272.  Everything that Sullivan explained to Hathaway about the Policy he eventually applied for appeared in the PRG brochure.  *Id*. S336-S337.

Based solely on what Sullivan represented to him, Hathaway signed the Application, which bears PHL's corporate logo.  *Id*. S272.

The investor that agreed to finance the premiums on Hathaway's Policy was Windsor Securities, LLC.  *Id.* S412-S414.  Windsor has made a handful of loans to insurance trusts like Hathaway's to finance insurance premiums.  *Id.* S415-S416. Its purpose is to receive a moderate return on investment when the loans are repaid. *Id*. S415, S417-S418, S427.  If an insurance trust fails to repay the loan, then

Windsor has the right to foreclose on the life insurance policy that was pledged as collateral for the loan. *Id*. S420, S422.

Hathaway's Policy was funded with a lump-sum premium payment in the amount of $200,000.00, which Windsor loaned to the Trust for that purpose. *Id*. S420, S423-S424, S427. Because the Trust failed to repay Windsor's loan, Windsor has foreclosed on the Policy and now claims ownership. *Compare id.* S16-S17 *with id.* 670 (admitting), S420, S423. As part of the arrangement, PRG/Giordano paid Windsor $40,000.00 as an incentive to make the loan. *Id*. S417-S418.

### Misstatements in the Application

No one disputes that the Application submitted to PHL contained incorrect information. It incorrectly stated that (1) Hathaway had a net worth of $6.25 million; (2) Hathaway's annual income was $484,000; (3) no financing would be used to pay premiums; and (4) there was no intention for a third-party to acquire the Policy. *Compare id.* S13-S14 *with id.* 670, 673 (admitting).

But there is a vigorous dispute over whether Hathaway is responsible for these misstatements. Although Hathaway admittedly signed the Application, he did not know—and could not know because he was illiterate—that he was signing an application with incorrect information. *Id.* S277. The Application he signed was blank or at least incomplete. *Id.* S354-S362, S372-S376. Neither then, nor

12

anytime afterward, did Sullivan or anyone from PHL review with Hathaway the misstatements in the Application. *Id*. S275-S276. To be perfectly clear, Hathaway did not fill out the Application and did not know where the $6.25 million or the $484,000 figures came from. *Id*. And he had no idea that the Application denied there would be premium financing or a third-party acquiring an interest in the Policy; on the contrary, Sullivan's repeated explanations to Hathaway, based on the PRG brochure, were that there *would* be premium financing and a third-party investor. *Id*. S272.

The Hathaway Trustee was equally in the dark. He did not know where the misrepresented figures or other information came from; nor did he fill out the Application. *Id*. S286, S290. There is no evidence the Trustee knew about the misrepresentations in the Application. *Id*. S285-S286.

Sullivan testified that he did not fill out the Application, did not know how the inaccuracies were added to it, and would not have answered those questions falsely if he had filled it out. *Id*. S356-S357, S359-S362. Although in conversations Sullivan attributed more value to Hathaway's real property than it was likely worth, he still did not insert the inaccuracies into the Application. *Id*. S364. PRG gave Sullivan the Application and other papers for Hathaway to sign and Sullivan gave those papers to Hathaway. *Id*. S320, S351. After securing signatures from Hathaway and the Trustee, Sullivan turned over all the signed

paperwork to PRG for further processing; he does not know who inserted the false information about net worth, annual income, premium financing, or acquisition of the Policy by a third party. *Id.* S356-S362, S372-S376.

In short, Hathaway, the Trustee, and Sullivan agree that the Application contains misstatements—but those errors were not their doing. *Id.* S275-S277, S372-S376. When the Application was turned over to PRG, it was blank and not completely filled in. *Id.* S354-S362, S372-S376. Neither Hathaway nor the Trustee could have put the inaccuracies in the Application.

No evidence has come to light revealing who inserted the false information. But the most reasonable inference from available evidence is that PHL's own agents, either PRG/Giordano or Crump, inserted the erroneous information and then submitted it to PHL. Sullivan always turned the Hathaway insurance papers over to Diediker (PRG) for processing. *Id.* S362. If the erroneous information was not in the Application when Sullivan turned it over to PRG, then that information could only have been inserted while it was in PRG's possession, or later in Crump's possession. *Id.* S372-S376. Once it left their hands, the Application never returned to Sullivan, the Trustee, or Hathaway. *Id.*

Inaccuracies in the Application should have been identified by an independent investigator called Infolink, which PHL employs to verify key information in insurance applications before issuing policies. *Id.* S196-S198. The

report Infolink prepared in connection with the Hathaway Application supposedly indicated that Hathaway had confirmed that all information in the Application was correct—including information related to his net worth and annual income.  *Id.* S196-S199, S392-S394.

But in fact, no conversation between Infolink and Hathaway ever occurred. Hathaway testified that Infolink never contacted him about the Application.  *Id.* S278-S279.  The Trustee confirmed that testimony.  *Id.* S288.  It is unclear how the Inspection Report on Hathaway ended up in PHL's files when nobody from Infolink ever contacted Hathaway.  Infolink destroyed whatever documents it had on Hathaway pursuant to its document retention policy.  *Id.* S396.

### PHL Pays Commissions on the Policy

After receiving the initial premium of $200,000, loaned from Windsor to the Trust, PHL issued the Policy and paid hefty commissions to its agents.  Crump received a commission of $40,000.00.  *Id.* S58.  As provided in the Crump-Giordano Top Producer Agreement, Crump then paid a commission of about $40,000 to Giordano.  *Id.*  Under the PHL-Giordano Agreement, PHL also directly paid Giordano $180,000.  *Id.* S58; *compare id.* S24-S25 *with id.* 670 (admitting). And Giordano (PRG) paid Diedeker a commission of (it is believed) approximately $38,000 and then paid Sullivan approximately $17,500. *Id.* 276, S377-S378.

15

### PHL's 2008 Investigation

Soon after PHL issued the Hathaway Policy and collected the initial premium, both PHL and Crump became suspicious of Giordano and PRG. In the Spring of 2008, only a few months after the Policy had been issued, Crump began investigating Giordano's business practices. *Id.* S61-S63; *compare id.* S17 *with id.* 670 (admitting). In August 2008, its investigation having confirmed concerns, Crump suspended Giordano and PRG's authority to write insurance policies through Crump. *Id.* S61, S63.

On December 18, 2008, PHL received a letter from the Utah Department of Insurance requesting PHL's assistance with an investigation that the Department was conducting into the conduct of an unnamed insurance producer that it suspected was engaged in selling stranger-owned life insurance. The Department specifically requested information from PHL regarding the Hathaway Policy, including the Interlink Inspection Report. *Compare id.* S18 *with id.* 670 (admitting).

When PHL received the letter from the Department, it was already investigating the Application as part of its investigation into Giordano and PRG. *Id.* 678. That investigation began sometime in the fourth quarter of 2008 after PHL became aware of suspicious information regarding Giordano. *Id.* S207. "[W]e quickly had concern," PHL's key witness testified, "relative to

16

representations made by the insureds and trustees [in Giordano/PRG applications] relative to their income and net worth." *Id.* "Upon reviewing [Giordano] cases that were in house," the PHL witness continued, "our investigation area began looking at additional information which impeached the credibility of the net worth figure in particular." *Id.*

PHL's corporate auditing department completed its investigation into Giordano's suspect practices late in the fourth quarter of 2008. *Id.* S207-208. On May 5, 2009, PHL wrote to Hathaway (copy to the Trustee) requesting additional information about representations made in the Application but received no response until after PHL filed this action. *Compare id.* S22 *with id.* 670 (admitting). The letter stated that "[f]ailure to provide the information requested above in the time specified may require PHL to consider all legal options available to it, including but not limited to seeking to rescind the Policy." *Id.* S404-S405.

### PHL Continues to Collect Premiums Until the Last Minute

PHL did nothing to rescind the Policy or notify Hathaway and the Trustee of its intent to deny its validity for well over a year—from December 2008 when (at the latest) it completed its investigation until January 28, 2010 when it filed suit. During this 13-month period, and even through March 2010, PHL continued to collect monthly premiums of at least $5,000 on the Policy. *Id.* S194, S205; *compare id.* S16-S17 *with id.* 670 (admitting).

17

The Policy contains an "Incontestability" clause, which prohibits PHL from rescinding the Policy after two years from the Policy's issue date (January 31, 2008) on the basis of a misrepresentation in the Application. *Compare id.* S15-S16 *with id.* 670 (admitting), S238-239. After drawing out $145,000 in premiums, PHL commenced this lawsuit to rescind the Policy on January 28, 2010—just three days before the two-year period expired. *Id.* 4.

**B.    Relevant Procedural History.**

PHL filed its Complaint against the Trust on January 28, 2010 in the United States District Court for the District of Utah, Central Division, and then filed its First Amended Complaint ("FAC") on June 30, 2010. *Id.* 30-41. Count I of the FAC sought a declaration that the Policy was void and rescinded *ab initio* due to material misrepresentations in the Application. *Id*. 37-38. PHL also sought an order allowing it to retain all premiums paid for the Policy as an offset against its alleged damages. *Id*. Count II sought a declaration that the Policy was void and rescinded *ab initio* for lack of an insurable interest. *Id*. 38-39.

The district court granted Windsor's unopposed motion to intervene. *Id.* 8-9. After the court denied the Trust's motion to dismiss, the defendant parties filed answers denying the key allegations in the FAC and asserting various affirmative defenses. *Id.* 42-68.

18

PHL and Windsor both moved for summary judgment on Counts I and II of the FAC. *Id*. 84-87, 91-93. The Trust filed a joinder in Windsor's motion on the same date. *Id*. 88-90. On December 3, 2013, the district court agreed with PHL as to Count I (rescission) and entered summary judgment in PHL's favor. *Id*. 752-770. The summary judgment also authorized PHL to keep all premiums paid on the Policy. *Id*. 767-770. The court declined to rule on PHL's insurable interest claim under Count II, declaring it "moot." *Id*. 767. The court then directed the clerk of the court "to close the case." *Id.* 770.

On December 30, 2013, Windsor and the Trust filed motions to alter or amend the judgment under Rule 59(e) and for relief from the judgment under Rule 60(b) of the Rules of Civil Procedure. *Id*. 772-793. The district court denied those motions on February 11, 2015. *Id*. 824-825. Windsor and the Trust filed their respective notices of appeal on March 10, 2015. *Id*. 826-827, 829-830.

## C.    The District Court's Decision.

The district court ordered that the Policy be rescinded and that PHL retain premiums paid on the Policy. *Id.* 770. The order stemmed from the district court's ruling that the Application contained material misrepresentations regarding Hathaway's finances that, notwithstanding Hathaway's illiteracy, Hathaway or the Trust knew or should have known. *Id*. 758-759, 761. The district court also ruled that Crump and Giordano were not PHL's agents and, therefore, that PHL did not

waive its right to rescind the Policy. *Id*. at 762-763. Although acknowledging that the "question of whether an insurance agent is the agent of the insurer or the insured is a question of fact," the district court ruled that Crump and Giordano were not PHL's agents because they could not unilaterally bind PHL to issue the Policy. *Id*. Finally, the district court ruled that PHL was entitled to retain the premiums—an admitted departure from general rescission law—because of the equities of the case. *Id*. 767-770.

## SUMMARY OF ARGUMENT

1.      The district court erred in granting summary judgment for PHL on its rescission claim for two reasons.

      a.      First, PHL waived the right to rescind. Subsections (2) and (5) of Utah Code § 31A-21-105 allow an insurer to rescind an insurance policy when it has reasonably relied on a material misrepresentation, but *only* if the insurer gives notice to the insured within 60 days of discovering the factual basis for the claim of misrepresentation. PHL discovered the misstatements in the Application by the end of December 2008 but failed to provide notice of intent to rescind until 13 months later when it filed this action. There is no genuine factual dispute on this point. As a matter of law, PHL's failure to meet the statutory notice requirement constitutes waiver requiring reversal of the district court's order and entry of summary judgment for the Trust and Windsor.

Waiver also arises because PHL collected hefty premiums for 13 months despite knowing of the misstatements and, further, because of the actions and imputed knowledge of PHL's agents, who either put the misstatements in the Application or at least knew about them.  At a minimum, there are numerous disputed issues of material fact about waiver, precluding summary judgment.

      b.    Second, PHL failed to satisfy the basic requirements of rescission under Utah Code § 31A-21-105(2).  Affording all disputed evidentiary inferences to the Trust and Windsor, PHL cannot show by clear and convincing evidence that it reasonably relied on a misstatement in the Application that Hathaway or the Trustee knew or should have known was false.  Hathaway never knew about misstatements in the blank Application Sullivan had him sign, and there is no clear, undisputed evidence proving that he should have known.  So too with the Trustee.  The truth is, they were ignorant of the misstatements and their ignorance isn't enough to constitute misrepresentation.  Utah law holds, moreover, that an insurer that conducts a cursory investigation into the truthfulness of application statements does not reasonably rely.  Here, PHL's investigator (Infolink) failed to conduct a proper investigation—even failing to ask Hathaway about the misstatements—and so PHL did not reasonably rely.  Genuine factual disputes about misrepresentation and reliance deeply infect the district court's rescission ruling, again precluding summary judgment.

2.    The district court also erred by allowing PHL to keep Policy premiums while granting its rescission claim.  That ruling directly conflicts with Utah law and is especially ironic as an equitable remedy when PHL unjustly collected premiums for 13 months after it knew about the misstatements in the Application.  Even if this Court determines that rescission is appropriate, the district court's ruling allowing PHL to retain premiums should be reversed.

## ARGUMENT

An award of summary judgment is reviewed *de novo*, applying the same legal standard used by the district court.  *First Sec. Bank v. Pan Am. Bank*, 215 F.3d 1147, 1153 (10th Cir. 2000) (citation omitted).  Summary judgment is correct only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Moreover, "the substantive law will identify which facts are material," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In reviewing the grant of summary judgment, this Court will "examine the factual record in the light most favorable to the nonmoving party." *First Sec. Bank*, 215 F.3d at 1153 (citation omitted).  If that examination reveals no genuine issue of material fact, the Court will then "determine if the substantive law was correctly

applied by the district court." *Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir. 1995) (citation omitted).

The district court failed to observe these basic requirements, erroneously granting PHL summary judgment despite undisputed facts establishing that PHL waived its right of rescission and despite numerous genuine factual disputes regarding the elements of rescission.

## I.    PHL Waived Any Right to Rescind the Hathaway Policy.

Although the district court's ruling ignores numerous disputed facts, the most direct way for this Court to dispose of this case is to hold that PHL waived any right to rescind by failing to give timely notice. The facts on this point are not in dispute and the district court erred in denying the Trust and Windsor summary judgment on that ground.

### A.    PHL breached its statutory duty to notify Hathaway of its intent to rescind the Policy within the 60-day deadline.

PHL waived its right to rescind the Hathaway Policy by missing the 60-day notice deadline under Utah Code § 31A-21-105(5). The district court's ruling unaccountably fails to address this issue. The effect was to erroneously grant PHL an unqualified right to rescind the Policy during the two-year contestability period contrary to Utah law.

The Utah Insurance Code tightly constrains when an insurer may rescind an insurance policy. Subsection (2) of § 31A-21-105 allows rescission in the event

23

the insurer reasonably relies on material misrepresentations in the application. PHL sought to rescind the Policy on that basis.  But the rescission remedy provided in subsection (2) is conditioned on compliance with the strict notice requirements of subsection (5).  *See* Utah Code § 31A-21-105(2) ("[e]xcept as provided in Subsection (5)").

Subsection (5) prescribes a notice requirement and associated time limits for an insurer intending to challenge the validity of an insurance policy:

> If after issuance of a policy the insurer acquires knowledge of sufficient facts to constitute a general defense to all claims under the policy, *the defense is only available if the insurer notifies the insured within 60 days after acquiring the knowledge of its intention to defend against a claim if one should arise*, or within 120 days if the insurer considers it necessary to secure additional medical information and is actively seeking the information at the end of the 60 days.

*Id.* § 31A-21-105(5) (emphasis added) (a copy of Utah Code § 31A-21-105 is contained in the Attachment to this brief).  Section (5) further clarifies that "an insurer has acquired knowledge only if the information alleged to give rise to the knowledge was disclosed to the insurer or its agent in connection with communications or investigations associated with the insurance policy under which the subject claim arises."  *Id.*

In sum, an insurer's failure to give 60-day notice of its intent to deny the validity of the policy waives its right of rescission otherwise available under § 31A-21-105(2).[2]

Here, PHL waived its right to rescind the Hathaway Policy by failing to notify the Trust of its intent to disavow the Policy within the 60-day period prescribed by Utah law.

*First*, PHL's action is based on alleged reliance on material misrepresentations in the Application that, if proven, would present "sufficient facts to constitute a general defense to all claims under the policy." *Id*. § 31A-21-105(5). That is, if PHL's claim under § 31A-21-105(2) is valid, then the Policy may be rescinded.

*Second*, the record demonstrates that the information concerning the inaccuracies in the Application "was disclosed to the insurer . . . in connection with . . . investigations associated with the insurance policy under which the subject claim arises." *Id.* In particular, PHL has admitted that it "learned of the misrepresentations during an investigation, which was commenced after receipt of an inquiry from the Utah Department of Insurance related to the Policy." Aplt. App. S444; *accord id.* S20-S21 (quoting S444); *id.* 670 (admitting).

_____

[2] The 120-day time period mentioned in § 31A-21-105(5) is irrelevant because none of the inaccuracies in the Application involves medical information.

*Third*, PHL learned of the inaccuracies in the Hathaway Application by December 2008. Aplt. App. S207-S208 (testifying that "the investigation culminated with regard to our law department in December of 2008"). Although no precise date appears in the record, December 31, 2008 is the latest that PHL knew that the Application contained inaccuracies that could support "a general defense to all claims under the policy." Utah Code § 31A-21-105(5). By then PHL knew or should have known it would defend against any claim for benefits under the policy.

*Fourth*, PHL had a legal duty to notify the Hathaway Trust of its "intention to defend against a claim if one should arise" within 60 days of when it learned of the inaccuracies. *Id.* Taking December 31, 2008 as the latest starting point, PHL should have notified the Trust of its intentions by March 1, 2009.

*Fifth*, PHL failed to notify Hathaway of its intention to disavow the Policy before the March 1 statutory deadline. There is no record of PHL communicating with Hathaway or the Trust at all within the 60-day window prescribed by subsection (5).

Careful application of subsections (2) and (5) conclusively demonstrates, then, that PHL waived its right to rescind the Policy by failing to give timely notice of PHL's intention to challenge the Policy.

PHL understandably resists this conclusion.  It interprets subsection (5) to require notice to the insured only when a rescission claim is "made in response to an insured's or beneficiary's claim for benefits under a policy" and so considers itself not bound by the 60-day notice period.  Aplt. App. 687-688.  PHL also argued that "[it] complied with the statute by sending Hathaway and the Trust the May 5, 2009 letter, which expressly noted that a failure to respond to PHL's letter may result in rescission of the policy."  *Id.* 688.  In PHL's view, "[t]his letter clearly put Hathaway and the Trust on notice of PHL's 'intention to defend against a claim.'" *Id.* 688 (quoting Utah Code § 31A-21-105(5)).

This argument fails for two reasons.  First, PHL misreads the statute to require notice only when an *insured* has already made a claim, thus allowing an insurer with sufficient knowledge of a general defense like rescission to continue collecting premiums for years until the policy holder eventually makes a claim.  But the plain language of subsection (5) conditions the insurer's ability to press "a general defense to all claims under the policy" on timely notice to the insured of "its intention to defend against a claim *if one should arise*."  Utah Code § 31A-21-105(5) (emphasis added).  The italicized language plainly addresses the insurer's intent with respect to future claims under the Policy, not just present ones.  Under PHL's interpretation, insurers with knowledge of a defense under subsection (2) would be free to rescind insurance policies without the fairness of any prior notice

to the insured—exactly as PHL did by filing suit at the tail end of the contestability period without prior notice to Hathaway or the Trustee. This Court should reject PHL's reading of subsection (5) as incompatible with the statutory text and the Utah Legislature's policy of fair notice.

Second, PHL is mistaken in characterizing the May 5, 2009 letter as sufficient notice. Subsection (5) requires notice of the insurer's "intention to defend against a claim if one should arise." Utah Code § 31A-21-105(5). The letter did no such thing. It only warned Hathaway that "[f]ailure to provide the information requested above in the time specified *may* require PHL Variable to *consider* all legal options available to it, including but not limited to seeking to rescind the Policy." Aplt. App. S405. Pressed to identify the import of the May 5 letter, the district court ruled that it "merely demonstrates that [PHL] was investigating possible misrepresentations in Hathaway's application." *Id.* 764. But PHL already knew or should have known about those misrepresentations by December 2008. And at any rate a warning that rescission might occur unless Hathaway answered certain questions did not satisfy the statutory requirement of providing notice that PHL *intended* to seek rescission.

Furthermore, even if the letter gave Hathaway adequate notice, it was untimely. May 5 is still more than 60 days beyond the 60-day notice period prescribed by statute.

28

The Trust's and Windsor's waiver defense under subsection (5) appears nowhere in the district court's opinion. Yet it disposes of PHL's entire case. Having missed its statutory notice deadline—having sat on its rights for over a year—PHL has no right to challenge the Policy based on inaccuracies in the Application. Summary judgment in favor of PHL should be reversed and an order should be entered instructing the district court to enter summary judgment for the Hathaway Trust and Windsor. *See Faustin v. City and County of Denver,* 423 F.3d 1192, 1195, 1201 (10th Cir. 2005) (reversing a grant of summary judgment for Plaintiffs and remanding "with instructions that summary judgment be entered for Defendants").[3]

If the Court is reluctant to grant summary judgment for Windsor, the district court's order granting summary judgment for PHL still should be reversed. At a bare minimum, a genuine issue of material fact exists as to exactly when PHL knew or should have known of facts triggering its duty to give notice under subsection (5). That factual dispute is best resolved by the district court at trial.

---

[3] Remand is unnecessary for a summary judgment order to cover PHL's alternative claim that the Policy is void for lack of insurable interest. Although the district court declined to rule on that claim, *see* Aplt. App. 767, PHL's waiver under subsection (5) also deprives it of any alleged right to void the Policy for lack of an insurable interest. Rescission based on that theory is no less "a general defense to all claims under the policy" than rescission based on misrepresentation and so is equally subject to the same 60-day notice requirement. Utah Code § 31A-21-105(5).

### B. PHL also impliedly waived its right to rescind the Hathaway Policy through its course of conduct.

#### 1. PHL waived its right to rescind by accepting premiums after learning of the inaccuracies in the Application.

Utah law defines waiver as "the intentional relinquishment of a known right," which applies when there is "an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it." *Soter's, Inc. v. Deseret Fed. Savings & Loan Assoc.*, 857 P.2d 935, 942 (Utah 1993) (quotations and citations omitted).

An insurer like PHL forfeits or waives the right to rescind a policy if it engages in a course of conduct that demonstrates an intention to relinquish that right. *See Cont'l Ins. Co. v. Kingston*, 114 P.3d 1158, 1161 (Utah App. 2005); *see also Farrington v. Granite State Fire Ins. Co.,* 232 P.2d 754 (Utah 1951). Billing an insured for premiums after learning of misrepresentations in the insurance application is evidence that the insurer has waived the right to rescind the policy. *See Cont'l Ins. Co.*, 114 P.3d at 1164 (holding that acceptance of premiums after an insurer learned of misrepresentations indicated its "intention to continue the policy, despite the contents of the application"); *accord Farrington*, 232 P.2d at 758 (holding that "acceptance of the more than half of the premium" operated as "a waiver of [the insurer's] right to rescind"). Indeed, the Utah Court of Appeals has endorsed the rule that "'[a]n insurer waives its right to seek rescission of a policy

when it knowingly accepts premium payments following the discovery of alleged misrepresentations upon which it claims to have relied when it issued the policy[.]'" *Cont'l Ins. Co.*, 114 P.3d at 1164 (quoting 44A AM. JUR. 2D *Insurance* § 1613 (2003)).

PHL received a lump sum of $200,000 to be credited toward the premiums required under the Policy. *Compare* Aplt. App. S16-S17 *with id.* 670. Monthly premiums of more than $5,000 were drawn from the Policy's premium deposit between 2008 and 2010. *Id.* PHL continued to draw premiums after it learned the Application contained inaccuracies. *Id.* And PHL has not only failed to tender a refund of the premiums to the Hathaway Trust, it has argued that it ought to keep the entire $200,000. *Id.* 767-770. Under *Continental Insurance Co.*, PHL waived its right to seek rescission of the Policy. The district court's contrary ruling—that PHL's knowing receipt of premiums after December 2008 "does not constitute an intentional relinquishment of PHL Variable's right to rescission," *id.* 765—flatly contradicts Utah law.

### 2. PHL waived its right to rescind by failing to exercise that right promptly after learning of the misstatements.

The Utah Supreme Court has explained that "[o]ne who claims a right to rescission must act with reasonable promptness, and if after such knowledge, he does any substantial act which recognizes the contract as in force, such as the

acceptance of the more than half of the premium would be, such an act would usually constitute a waiver of his right to rescind." *Farrington*, 232 P.2d at 758.

PHL did not act "with reasonable promptness" after it learned of the inaccuracies in the Application in December 2008. *Id.* Instead, it waited 13 months—between December 2008 and January 28, 2010—before it sought to exercise its right of rescission by filing suit. Aplt. App. 4. Notably, that was only three days before the contractual contestability period ran, which would have precluded rescission under the Policy and Utah law. *Id.*; Utah Code § 31A-22-403(2)(a).

This strongly suggests that PHL followed a calculated strategy of timing its litigation to maximize premiums from the Policy before launching an attack on its validity. If simply failing to act "with reasonable promptness" once an insurer learns of material misrepresentations can be construed as a waiver, *Farrington,* 232 P.2d at 758, then surely a calculated delay that profited PHL at appellants' expense should count as a waiver all the more. At very least this presents a genuine issue of material fact for which summary judgment in PHL's favor was improper.

## C.   **PHL waived its right to rescind the Hathaway Policy when the misstatements were known by, and likely produced by, its own agents.**

Waiver also exists because PHL had imputed knowledge of inaccuracies in the Application from its agents Crump, Giordano, and others. Indeed, at least one

such agent created the misstatements.  The parties hotly disputed the agency issue.
Aplt. App. S605-S607, 670-671.  Yet without the benefit of a trial, the district
court summarily ruled that "the contractual relationships between Crump and PHL
Variable and between Mr. Giordano and PHL Variable did not create an agency
relationship" and thus that "[a]ny knowledge of the misrepresentations in
Hathaway's policy application possessed by either Crump or Mr. Giordano cannot
be imputed to PHL Variable."  *Id.* 763.  This conclusion contradicts Utah law and
incorrectly resolved an intricate factual question on summary judgment.

Most critically, in the insurance context the focus of agency analysis is on
who provides compensation.  A person who is licensed to sell, solicit, or negotiate
insurance—referred to as a "producer"—is an agent for the person who
compensates him or her.  *See* Utah Code §§ 31A-1-301(91)(b)(i)-(ii).  Hence, a
"producer for the insurer" and thus "agent" for the insurer is someone "who is
compensated directly or indirectly by an insurer for selling, soliciting, or
negotiating an insurance product of that insurer."  *Id.*  And a "producer for the
insured" (referred to in the Code as a "broker") is someone who "is compensated
directly and only by an insurance customer or an insured . . . and receives no
compensation directly or indirectly from an insurer" for procuring the insurance
product. *Id.* §§ 31A-1-301(91)(c)(i)-(ii).

Crump and Giordano both received compensation from PHL for the Policy. *Compare* Aplt. App. S24-S25 *with id.* 670. No one was compensated directly by or from Hathaway or the Trust. *Id.* The district court itself found that PHL "paid a sales commission to Mr. Giordano" and also to Crump. *Id.* 755. They were therefore PHL's agents as a matter of law.

The district court reasoned that Crump and Giordano could not be agents of PHL because they could not "unilaterally bind [PHL] into issuing an insurance policy to Hathaway before Hathaway first submitted an application to [it]." *Id.* 763. But the Insurance Code doesn't condition the existence of agency on authority to unilaterally bind the insurer, and that has never been essential to agency. The court also mistakenly categorized Crump and Giordano as "brokers" for PHL, *id.* 762, despite the statutory definition that a broker is someone who is compensated directly by the *insured*. Utah Code §§ 31A-1-301(91)(c)(i)-(ii). Again, it is undisputed they were compensated directly by PHL, not by Hathaway or the Trust. Neither Crump nor Giordano can be considered PHL's "broker." Utah law categorizes both as "producer[s] for the insurer"—*i.e.*, agents for PHL. *See* Utah Code § 31A-1-301(91)(b)(i). The same holds for agents, like Sullivan, who were "compensated . . . *indirectly* [via Crump and Gordiano/PRG] by an insurer [PHL] for selling, soliciting, or negotiating an insurance product of that insurer." *Id.* (emphasis added).

34

Common law principles likewise confirm that there is at least a genuine factual dispute whether Crump and Giordano were PHL's agents. "To be an agent, a person must be authorized by another to act on his behalf and subject to his control." *Gildea v. Guardian Title Co.*, 970 P.2d 1265, 1269 (Utah 1998). An agent's authority can be actual or apparent. *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988). Apparent authority arises when "the acts or conduct of the principal . . . creates an appearance which causes a third party . . . to reasonably believe that a second party . . . has authority to act on the principal's behalf." *Posner v. Equity Title Ins. Agency, Inc.*, 222 P.3d 775, 781 (Utah Ct. App. 2009) (quotations omitted), *abrogated on other grounds by Coroles v. State*, No. 20130217, 2015 WL 1788799 (Utah Apr. 21, 2015).

Whether the tangle of overlapping contractual, financial, and working relationships between PHL, Crump, and Giordano created actual or apparent agency is a question of fact that requires examination of "all the facts and circumstances in the case." *Vina v. Jefferson Ins. Co.*, 761 P.2d 581, 585 (Utah App. 1988). The district court's sparse treatment of the agency issue, with its cursory and untenable conclusion that Crump and Giordano were PHL "brokers," falls far short of the proper analysis. The common law agency issue is laden with genuine factual disputes that can be resolved only at trial, not on summary judgment.

If, by statute or common law, Crump and Giordano/PRG are agents of PHL then their knowledge and actions are imputed to PHL. *See Farrington*, 232 P.2d at 756. That would include not only knowledge of the misstatements in the Application but their very creation.

## II. Viewing the Facts in the Light Most Favorable to Appellants, the District Court Erred in Ruling That Utah Law Allows PHL to Rescind the Policy.

Even if waiver does not apply, PHL still does not meet the statutory requirements for rescission. But before explaining why, a brief clarification is in order to prevent confusion. In its motion for summary judgment, PHL sought rescission on the ground that the Policy is part of an illegal "stranger-owned life insurance ('STOLI') scheme" because Windsor financed the premiums without an "insurable interest" in Hathaway's life. Aplt. App. 91-98. PHL advanced this argument passionately, in effect denouncing its own contractual agents (Crump, PRG, Giordano) as sinister "STOLI promoters." *Id.* 96-98. The district court, however, declined to "determine whether Mr. Hathaway's policy is void for lack of an insurable interest." *Id.* 767.

That was proper, for Utah law states that "[a]n insurance policy is *not* invalid because . . . the insurance policy is issued or procured in violation of" the provision prohibiting insurance without "an insurable interest in the subject of the insurance." Utah Code §§ 31A-21-104(2), (6) (emphasis added). Although so-

36

called STOLI policies may be unlawful, under Utah law an insurer like PHL cannot rescind them for that reason alone. Utah law in this respect tracks Wisconsin's. *See* Wis. Stat. § 631.07(4) ("Effect of lack of insurable interest or consent. No insurance policy is invalid merely because the policyholder lacks [an] insurable interest . . . .").

No amount of rhetoric denouncing "STOLI schemes" and "STOLI promoters" can alter the requirements of Utah's rescission statute or PHL's inability to satisfy them. And whether an insurable interest exists is not at issue in this appeal.

### A. The Utah Code expressly limits the right to rescind an insurance agreement for misrepresentation.

Utah law prescribes the following conditions for an insurer seeking to rescind an insurance agreement based on allegations of misrepresentation:

> Except as provided in Subsection (5), no misrepresentation or breach of an affirmative warranty affects the insurer's obligations under the policy unless:
>
> (a) the insurer relies on it and it is either material or is made with intent to deceive; or
>
> (b) the fact misrepresented or falsely warranted contributes to the loss.

Utah Code § 31A-21-105(2).

"In other words, an insurer may rescind a policy if any one of these three provisions is met: (1) the insurer relies on a material misrepresentation made by the

applicant; (2) the insurer relies on a misrepresentation that was made by the applicant with the intent to deceive; or (3) the applicant's misrepresentation contributes to the loss." *Derbidge v. Mutual Protective Ins. Co.*, 963 P.2d 788, 790-91 (Utah App. 1998). But "while the insurer must show only one of these three provisions has been met, under each alternative a threshold requirement is that the applicant have made a misrepresentation." *Id.* at 791. The insurer bears the burden of proof. *See Berger v. Minnesota Mut. Life Ins. Co.*, 723 P.2d 388, 390 (Utah 1986) (per curiam) ("an insurer need prove . . .").

Moreover, PHL bears a heightened burden of proof. At common law, a claim for rescission of a contract based on fraudulent misrepresentation must be proven by "clear and convincing evidence." *Schuhman v. Green River Motel*, 835 P.2d 992, 994 (Utah App. 1992); *see also Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991) (elements of fraud must be proven by clear and convincing evidence). Utah courts have not specifically addressed whether that heightened standard governs the insurance rescission statute. But insurance policies are contracts and the misrepresentation, intent, and reliance elements of the rescission statute are plainly rooted in common law fraud. Accordingly, this Court and Utah's Court of Appeals have previously looked to common law principles in interpreting Utah's rescission statute. *Cf. ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 494 F.3d 1238, 1247 (10th Cir. 2007) ("While the

38

common law was abrogated by [Utah's rescission] statute, . . . the common law can instruct the interpretation of the rescission statute."); *Derbidge*, 963 P.2d at 794 ("We see no necessary conflict between the common law rule [regarding the need for "knowledge or awareness" of a misstatement for rescission] and section 31A-21-105(2)."); *see generally Moore v. Energy Mut. Ins. Co.*, 814 P.2d 1141, 1144 (Utah App. 1991) (noting harmony between common law and the Utah Insurance Code).

It follows that, as with a claim for common law rescission based on fraud, Utah law requires PHL "to prove each element of fraud [in the rescission statute] by clear and convincing evidence." *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah App. 1994). Indeed, this Court has already concluded with respect to Oklahoma's insurance rescission statute—which the Utah Supreme Court has declared to be "essentially identical" to Utah's, *Berger*, 723 P.2d at 390 n.2—that the applicable standard of proof is clear and convincing evidence. *See Scottsdale Ins. Co. v. Tolliver*, No. 07-5083, 2008 WL 681676, at * 160-62 (10th Cir. Mar 11, 2008) (unpublished) (holding based in part on "Oklahoma's application of a clear and convincing standard of proof to fraud claims"). The same clear-and-convincing standard of proof applies here under Utah law.

Viewed in the light most favorable to the Trust and Windsor, PHL cannot meet even an ordinary burden of proof—much less a heightened one.

**B.    The district court erroneously brushed aside genuine issues of material fact regarding PHL's right of rescission.**

PHL based its argument for rescission on the first prong of the rescission statute—that "[PHL] relie[d] on [a misrepresentation in the Application] and [the misrepresentation] is either material or is made with intent to deceive."  Utah Code § 31A-21-105(2)(a).  The district court granted summary judgment based on its ruling that there was no dispute as to the elements of misrepresentation, reliance, and materiality.  Aplt. App. 757-763.

**1.    There is at least a genuine dispute whether Hathaway or the Trustee had sufficient knowledge regarding inaccuracies in the Application to constitute a "misrepresentation."**

**a.    The knowledge standard for proving misrepresentation.**

An applicant like Hathaway is not strictly liable for misstatements on an insurance application.  As the district court recognized, the rule under Utah law is that "to declare a misrepresentation and rescind an insurance contract, an insurer must show not only that it relied on the statement [in the insurance application] or that the statement was material, *but also that the applicant did something more than make an innocent misstatement*."  *Derbidge*, 963 P.2d at 795 (emphasis added);  Aplt. App. 757.  The Utah Court of Appeals held in *Derbidge* that the rescission statute "require[s] that an applicant have at least some knowledge or awareness of her misstatement."  *Derbidge*, 963 P.2d at 794.  As the district court noted, "[u]nder [the Utah] standard, a misrepresentation requires an act that may

fall short of intentional deception, but consists of more than mistake or negligence." Aplt. App. 757-758. This Court has interpreted the *Derbidge* standard as requiring "some level of bad faith before a misstatement may serve as a basis of rescission." *ClearOne Commc'ns*, 494 F.3d at 1244 n.3. "A misrepresentation occurs if the applicant knows or should have known about a misstatement in the application and still presents it to the insurer." *Id.* at 1247-48.

*ClearOne Communications* illustrates how the knew-or-should-have-known standard should be applied. There the National Union Fire Insurance Company rescinded ClearOne's executive liability policy based on misrepresentations in financial statements that were part of ClearOne's insurance application. ClearOne filed suit challenging the rescission. The misrepresentation arose when National Union sought specific confirmation that ClearOne had "certified its financials as required by Sarbanes-Oxley" and asked "if there were any non-compliance issues with respect to its revenue recognition practices." *Id.* at 1241. ClearOne's CFO responded that "there were no non-compliance issues and [that] the financials were certified," after which National Union issued a $3 million policy. *Id.* But it turned out that ClearOne's financial statements were not accurate, which precipitated several shareholder lawsuits and an SEC investigation. When ClearOne notified National Union that it would be tendering a claim under the policy, "National Union announced its intention to rescind the insurance contract *ab initio* based on

the 2002 financial misstatements, which it relied on in issuing the policy." *Id.* at 1242. The district court granted summary judgment for National Union on the rescission claim.

This Court reversed. It agreed with the district court that "the false financials constituted a misstatement for purposes of rescission." *Id.* at 1244. The issue was whether the misstatement was innocent or whether ClearOne "knew or should have known" about its falsity. As to actual knowledge, "[w]ith all inferences drawn in ClearOne's favor," the Court rejected the district court's ruling and held that, notwithstanding the CFO's personal assurance that the financial statements were accurate, there was "doubt" whether the CFO had "actual knowledge of the misstatements." *Id.* at 1249.

The Court then turned to whether the CFO nevertheless "should have known" of their falsity. The Court noted that under Utah law "corporate directors have a general obligation to know the financial condition of their corporations." *Id.* at 1249. It further observed that "under the Sarbanes-Oxley Act, the signing officer of a corporate 10-K (in this case, [the CFO]) is required to certify the accuracy of the corporation's financial statements" and to design an internal system that ensures the officer is provided "material information" regarding such matters. *Id.* One would think these legal duties would amply support a conclusion that the CFO "should have known" about the misstatements. Nevertheless, this

42

Court held that on "the record before us" it could not determine "if [the CFO] 'should have known' about the financial misstatements in the 10-K." *Id.* Pointing to unresolved disputes regarding whether "[the CFO] utilized reasonable internal controls that would have ferreted out the financial misstatements in the 10-K or whether she reasonably relied on Ernst & Young in conducting their business operations to satisfy the due diligence requirement of corporate directors," this Court ruled that "summary judgment on this question is inappropriate since the district court did not yet have the opportunity to consider these questions." *Id.* Accordingly, this Court "remand[ed] this matter to the district court to consider whether [the CFO] should have known about the financial misstatements." *Id.*

Applied to the record below, *ClearOne Communications* means that Hathaway and the Trustee cannot be charged with the requisite level of knowledge of the inaccuracies in the Application.

> **b.    Hathaway and the Trustee lacked knowledge of the misstatements.**

PHL complains of three misstatements in the Application concerning (1) inflated estimates of Hathaway's income and the value of his property, (2) denial of third-party financing of Policy premiums, and (3) denial that the Policy would eventually be sold. There is no dispute that the Application contains misstatements about these subjects. But PHL must prove by clear and convincing evidence that Hathaway and the Trustee knew or should have known of their falsity.

Although the elderly Hathaway signed the Application, he didn't know what was in it.  He couldn't read, and no one—not Sullivan, not Giordano, not PRG, not Crump, not PHL's independent investigator Infolink—ever reviewed the misstatements with him.  Aplt. App. S275-S279.  Likewise, the Trustee did not fill out the Application and had no knowledge that it contained false information.  Nor did Hathaway or the Trustee have any knowledge where the misstatements came from.  The evidence shows that when Hathaway and the Trustee signed the Application, it was either blank or not completely filled in.  Sullivan himself, who was selling the Policy on behalf of the PHL/Crump/PRG network, didn't even know because, as he testified, some unknown person in the PHL network upstream filled out those elements of the Application.  *Id.* S372-S376.

There is, in short, no evidence—much less clear and convincing evidence—that Hathaway or the Trustee knew about the *falsity* of the misstatements.  Indeed, there is no evidence they even knew about the existence of *any* statements in the Application, true or false, regarding those topics.

To prove a person "should have known" about a fact under Utah law requires that the surrounding facts and circumstances of the situation would reasonably have informed that person of the existence of the fact.  *See Colosimo v. Roman Catholic Bishop*, 156 P.3d 806, 816-17 (Utah 2007) (what a person "knew or should have known . . . requires evaluating the reasonableness of [that person's]

44

conduct"); *cf. O'Dea v. Olea*, 217 P.3d 704, 714 (Utah 2009) (knew or should have known "requires . . . knowledge or . . . sufficient notice that a . . . circumstance existed sufficient to alert him to conduct further inquiry"). Under this standard, the record facts, properly viewed, do not clearly show that Hathaway or the Trustee "should have known about [the] *falsity*" of the misstatements in the Application. *ClearOne Commc'ns*, 494 F.3d at 1247 (emphasis added).

Misstatements regarding assets. Of the three misstatements (*i.e.*, income and assets, premium financing, and sale of the Policy), the district court based its "should have known" ruling solely on the misstatement regarding income and assets.[4] Aplt. App. 758-759. And its analysis focused entirely on discussions Sullivan had with Hathaway about that topic, especially, as the district court noted, Sullivan's statement about assets being worth $4 million. *Id.* 753-754. The court also noted that Hathaway questioned such numbers when discussing property values with Sullivan. *Id.* S273 ("Q: Did you tell [Jay Sullivan], I'm not worth $4 million? A: That's what I asked. I says, Jay, what are you talking about?"). The

---

[4] To be clear, the court conducted no factual analysis on whether Hathaway should have known about the two other misstatements. Its determination that those also constituted misrepresentations appears to have been based on the legal conclusion that under *Theros v. Metropolitan Life Ins. Co.*, 407 P.2d 685 (Utah 1965), the illiterate Hathaway was under a duty to read and know the contents of the Application and thus, presumably, no factual inquiry was required. Aplt. App.758-759. Hence, if this Court concludes that *Theros* does not establish a *per se* rule and that there is an issue of fact precluding summary judgment regarding Hathaway's knowledge about misstatements regarding income and assets, then the rescission claim fails on summary judgment and the decision below should be reversed.

district court ruled that such evidence was so compelling that "even if Mr. Hathaway was unable to read the completed Application, no reasonable jury could find that Mr. Hathaway was unaware of the misrepresentations in his application." *Id.* 759.

That ruling is untenable.  Viewed in the light most favorable to appellants, precisely the opposite conclusion emerges.  Hathaway expressly *rejected* what he deemed an inflated net worth estimate.  Had he agreed to it, *perhaps* it could be argued that he "should have known" the fallacious estimate would find its way into the Application.  But he rejected it and thus had no reason to suspect that Sullivan, whom he obviously trusted, would insert it anyway.  There is certainly no undisputed evidence to the contrary in the record.  Sullivan never said any such thing.  Sullivan's testimony is that he *didn't* insert the erroneous estimate into the Application and doesn't know who did.  *Id.* S356-S362, S374-376.  The district court's ruling was based on the erroneous view that Sullivan filled out the Application.  *Id.* 754.

There is no clear evidence the illiterate, unsophisticated Hathaway should have known the Application would contain a false estimate of his financial position.

Misstatements about premium financing and sale of the Policy to a third-party.  The district court did not engage in any factual analysis of whether

Hathaway or the Trustee knew or should have known about the two other misstatements—and for good reason. The undisputed evidence is that all discussions between Hathaway and Sullivan were that the Policy would be financed and sold at some point after the Policy issued. *Id.* S272-S273. Neither Hathaway nor the Trustee ever denied that that was the bargain they discussed. *Id.* PHL's promoters marketed and sold the Policy on precisely those terms. *Id.* S336-S337.

Hathaway and the Trustee therefore had every reason to expect that once filled out the Application would accurately reflect that understanding. They in no sense "should have known" that the Application would contradict the deal by denying what everyone had agreed to from the outset.

Utah's rule is that under these circumstances false statements in insurance applications are not held against the insured:

> The rule supported by the great weight of authority is to the effect that if an applicant gives truthful answers to the questions contained in the application, but they are falsely recorded by an agent of the insurer, then the latter cannot rely upon the falsity of such answers to avoid liability under the policy issued upon the application in the absence of fraud, collusion, actual knowledge of the insured or the existence of circumstances from which constructive knowledge of such falsity might be imputed to him.

*Theros,* 407 P.2d at 688. A PHL agent—it is unclear precisely who but likely Giordano or PRG—"falsely recorded" that the Policy would not involve premium financing or a subsequent sale. But that was not Hathaway's or the Trustee's fault

47

since they had no reason to think anyone would insert such false information into the Application after it was signed.  *Compare* Aplt. App. S13-S14 *with id.* 670, 673-674.

Compare this situation with the facts in *ClearOne Communications*.  There, a sophisticated CFO provided corporate financial data that was vital to the Application and then expressly affirmed "there were no non-compliance issues and [that] the financials were certified" under Sarbanes-Oxley.  Yet this Court reversed and remanded for further factual development on whether the CFO "should have known" of the misstatements.  *ClearOne Commc'ns*, 494 F.3d at 1241.  By contrast, here, an illiterate, unsophisticated insured relied on agents of the insurer to properly fill out the Application to reflect the deal those same agents had marketed to him.  If the facts in *ClearOne Communications* were not enough to prove that the insured should have known of the misstatement, then *a fortiori* neither are the facts here.

Finally, lacking the requisite undisputed evidence of knowledge, the district court relied on *Theros* for the proposition that "an insured is under a duty to read his application before signing it and will be considered bound by a knowledge of the contents of his signed application."  *Id.* at 688.  That is true as a general proposition, but the *Theros* Court noted an "exception" where the insured "by fraud, accident, *misrepresentation*, imposition, *illiteracy*, *artifice* or device [was]

reasonably prevented from reading the application before signing it." *Id.* (emphases added). It was precisely this exception that the district court ignored.

*Theros* was later clarified by the Utah Supreme Court. Only two years later, that court refused to apply the presumption against an insured due to "significant differences" in the facts. *Marks v. Cont'l Cas. Co.*, 427 P.2d 387, 388 (Utah 1967). In *Theros*, the *Marks* court explained, "the agent was present with the insured in the latter's home, filled out the false answers in his presence, and handed the application to the insured for his signature." *Id.* By contrast, the insured in *Marks* received a form in the mail with a note from the insurance agent that read: "you can just sign it and mail it back if you want to, and I will take care of it from there." *Id.* In response, the insured "signed the application in blank" and mailed it back. *Id.* Based on these different facts, the Utah Supreme Court held that the presumption in *Theros* did not apply. *Id.*

Hathaway is illiterate—one of the express exceptions in *Theros*. And as in *Marks* and in contrast with *Theros*, the insured (and Trustee) signed a blank Application and trusted the insurance agent to ensure it was filled out and processed in accordance with their agreement. Viewing the facts in the light most favorable to appellants, a reasonable inference arises that Hathaway himself was the object of a PHL-sponsored scheme of "misrepresentation . . . artifice or device" that reasonably prevented him from understanding the misstatements in the

Application.  *Theros*, 407 P.2d at 688.  The district court's application of *Theros* was inapposite.

Once again, this Court's nuanced approach in *ClearOne Communications* is instructive.  There, the Court recognized that the CFO had "a general obligation to know the financial condition of [her] corporation[]" and was legally bound under federal law "to certify the accuracy of the corporation's financial statements," but held that despite those duties there were still issues of fact for the trial court to resolve before it could find that the CFO should have known of the misstatements.  494 F.3d at 1249.  So too here.

Given the state of the record, there are genuine issues of fact whether Hathaway and the Trustee knew or should have known about the misstatements in the Application.

> **2.  The district court failed to provide an evidentiary basis and analysis for its ruling regarding reliance; a proper analysis refutes the existence of reliance or at least establishes a genuine dispute of fact.**

Besides proving a misrepresentation, an insurer seeking rescission must establish that a misstatement was material and that the insurer relied on it.  The district court ruled that "there is no genuine issue that [PHL] relied on material misrepresentations about Mr. Hathaway's finances when it issued Mr. Hathaway's life insurance policy."  Aplt. App. 761.  This ruling should be reversed for two reasons.

First, the district court confused the materiality analysis and the reliance analysis, essentially ignoring the latter. Before reaching its conclusion on reliance, the court spent a page outlining the evidence and legal reasons for its ruling on *materiality*, which is not challenged on appeal. *Id.* 760-761. The court failed, however, to base its *reliance* ruling on any evidence or legal analysis. The court merely asserts that "[PHL] would not have insured Mr. Hathaway for $4,000,000 had it known the true extent of his assets." *Id.* 760. But as the court's analysis immediately following indicates, this statement is based not on evidence of reliance but on materiality.

The district court essentially conflated the distinct concepts of materiality and reliance, failing to address the latter. Yet the difference, while subtle, is important, which is why the rescission statute requires PHL to prove both. Materiality refers to whether the misrepresentation should, in theory, affect the insurer's decisions.[5] Reliance, by contrast, goes to whether the misrepresentation

---

[5] *See, e.g.*, *Fid. & Cas. Co. v. Middlemiss*, 135 P.2d 275, 279 (Utah 1943) ("A material representation is one which ordinarily would influence a prudent insurer in determining whether to accept or reject a risk, or in fixing the amount of premium in the event of such acceptance, or in excepting some risk or part thereof from coverage."); *see also ClearOne Commc'ns*, 494 F.3d at 1250 ("A fact is material to the risk assumed by an insurance company if reasonable insurers would regard the fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application.").

actually affected the insurer's decisions—whether it in fact took some action to its detriment because it was misled.[6]

What's more, the insurer's reliance must be reasonable. In *Hardy* the Utah Supreme Court instructed that "[a]n insurance company cannot escape liability on a policy if it is established that there should have been no actual reliance on the applicant's misrepresentation, concealment, or omission." 763 P.2d at 770. The court further underscored the necessity of an insurer's acting reasonably in its reliance:

> There are two corollaries to this rule which, if shown, prevent the insurer from escaping liability: (1) if the insurer has information which would have put a prudent person on notice of possible falsity and would have caused an inquiry which, if carried out with reasonable diligence, would have revealed the truth, the insurer cannot rely on the misrepresentation; and (2) *if the insurer chooses to make an independent inquiry and a reasonable search would have uncovered the misrepresentation but the facts were not discovered because the investigation was cursory, the insurer cannot rely on the misrepresentation.* An insurance company is charged with facts which it ought to have known and cannot blind itself from ascertaining the truth and then claim willful misrepresentation of the truth on which it relied in order to avoid payment under policy.

---

[6] *See, e.g.*, *Hardy v. Prudential Ins. Co. of America*, 763 P.2d 761, 766 (Utah 1988) (referring to Utah Code § 31A-21-105 as "requir[ing] reliance or causation of loss"); *Cont'l Ins. Co.*, 114 P.3d at 1160 n. 6 (reasoning that a policy is voidable if any material misrepresentation made on the application was "actually relied on to [the insurer's] detriment"); *Home Sav. and Loan v. Aetna Cas. & Sur. Co.*, 817 P.2d 341, 380 (Utah App. 1991) (explaining reliance in terms of being "misled" and giving the example of a case were a Washington court held that an "employee was covered despite [a] nondisclosure because the insurance company had not relied on the application and *therefore had not been misled by the nondisclosure*") (emphasis added).

*Id.* (quotations and citations omitted) (emphasis added). Notably, much of the *Hardy* court's reliance holding comes from this Court's incisive analysis in *Major Oil Corp. v. Equitable Life Assurance Soc'y*, 457 F.2d 596 (10th Cir. 1972) (unpublished).

Second, the district court failed to address pages of evidence and argument from Windsor's summary judgment briefing demonstrating (at a minimum) that a genuine issue of fact exists as to whether PHL could have reasonably relied on the misstatements regarding Hathaway's assets when its agents knew of their falsity all along and indeed were responsible for them. Aplt. App. S607-S615. The court also failed to explain why reliance exists when, as a matter of undisputed testimony from PHL's own corporate witness, PHL does *not* truly rely on assertions in a mere insurance application but rather on the verification of those assertions by its independent investigator Infolink. *Id.* It was only after Infolink falsely provided such verification that PHL issued the Policy. A reasonable inference from the evidence is that PHL actually relied not on the Application but on Infolink.

Again quoting *Hardy*, Utah law holds that "if the insurer chooses to make an independent inquiry and a reasonable search would have uncovered the misrepresentation ***but the facts were not discovered because the investigation was cursory, the insurer cannot rely on the misrepresentation.***" *Hardy*, 763 P.2d at

770 (emphasis added). PHL chose to conduct an independent inquiry through Infolink that was so "cursory" it failed even to ask Hathaway about the details of his Policy. Had it done so, there is every reason to believe—and Windsor and the Trust are entitled to the inference—that Hathaway would have answered truthfully about all the misstatements. Hence, PHL "cannot rely on the misrepresentation." *Id.*

Finally, the district court's reliance ruling is deficient because it makes no mention of the alleged misrepresentations regarding no premium financing and no sale of the Policy. Without such a foundation, those misstatements cannot be a basis for summary judgment on the rescission claim.

These fatal flaws in the district court's reliance analysis, and those in its analysis regarding misrepresentation, should have precluded summary judgment on the rescission claim. At a minimum, there are numerous genuine factual disputes that only the trier of fact can fairly resolve.

## III. PHL Has No Legal Right to Retain Premiums Paid Under an Agreement It Rescinded.

If this Court affirms the district court's ruling that PHL is entitled to rescission, the $200,000 in Policy premiums should be returned to the Trust and, ultimately, to Windsor. The district court agreed that PHL should be allowed to keep the premiums to offset "its damages related to issuing the policy, paying brokers, and incurring attorneys' fees and costs." Aplt. App. 767-770. While

acknowledging that "[i]n life insurance cases, this doctrine generally allows an insured to recover the premiums they have paid," the court insisted that it had "discretion to depart from the general rule when equity so requires." *Id.* That ruling contradicts Utah law.

Only three years ago the Utah Supreme Court repudiated the notion that an insurer may compel an insured to cover unanticipated costs. *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 270 P.3d 464, 471 (Utah 2012). The court in *United States Fidelity* held that "an insurer's right to recover reimbursement from an insured may only arise, if at all, under the written terms of their insurance policy" and that "there can be no extracontractual right to restitution between the insurer and its insured, and only the express terms of a policy create an enforceable right to reimbursement." *Id.* at 470-71. In so limiting reimbursement remedies, Utah's rule is consistent with the majority rule in other states. *See* 44 AM. JUR. 2D *Insurance* § 920 (2015) ("An insurance company is generally required to tender a refund of premiums paid, when it rescinds an insurance policy for misrepresentation . . . .").

PHL expressly agreed that premiums would be returned if the policy were rescinded:

> If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of

> any Monthly Deductions made under this policy for the contested face
> amount.

Aplt. App. S238-S239.   Because PHL has contested the validity of the entire

Policy by seeking rescission, under *United States Fidelity* the Policy properly

dictates that PHL return all paid premiums or "the sum of any Monthly Deductions

made under this policy," whichever amount is greater.  *Id.*

The district court did not discuss the dispositive language of the Policy or

the Utah Supreme Court's hostility to judge-made remedies for insurers.

Unmoored by contract or controlling precedent, the district court indulged in a

standardless inquiry into "whether it is equitable to allow PHL Variable to keep the

premiums that Windsor Securities has already paid on the policy."  Aplt. App. 767.

Ignoring PHL's year-long intentional delay, which allowed it to collect tens of

thousands of dollars in premium draws, the court reasoned that equity would be

better served by letting PHL keep the premiums because "Windsor Securities

would profit from the return of the initial premium payment," in that it "received

$40,000 from Mr. Giordano in return for financing the policy."  *Id.* 769.  And the

court distinguished *United States Fidelity*, ruling that "[t]he return of premiums

does not affect the insured because Hathaway did not pay for the initial premium."

*Id.*

But the distinction between premiums paid by the insured alone and

premiums paid by the insured via a loan from a third-party investor is contrived.  It

56

appears nowhere in *United States Fidelity*, which rejected judge-made remedies for an insurer's loss—including the equitable remedy of restitution. The decision in *United States Fidelity* emphasized the primacy of the written insurance policy. *See* 270 P.3d at 469-71.  Moreover, the payment from PHL-agent Giordano can hardly be held against Windsor, and certainly not in an amount five times its value.

In short, by refusing to apply *United States Fidelity* the district court committed plain error and its order addressing the ownership of premiums must be reversed.  *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) ("In cases arising under a federal court's diversity jurisdiction, . . . [t]he federal court must defer to the most recent decisions of the state's highest court." (quotations omitted)).[7]

---

[7] Considered purely from an equitable perspective, the district court's logic is dubious. It is hard to see why allowing PHL to keep $200,000 in premiums produces a fairer result than returning the premiums to the party that paid them.  Letting Crump and Giordano pocket six-figure commissions on policies the insurer rescinds encourages other broker-agents to solicit premium-financed policies solely for short-term profit regardless of whether the insurance company or the insured benefits from the issuance of a policy. And the unfairness of that result is deepened by the fact that PHL can recover the value of the commissions by enforcing its contractual rights against Crump and Giordano, Aplt. App. 769-770, rather than compelling Windsor to bring suit against them.

## **CONCLUSION**

This Court should reverse the summary judgment in favor of PHL and enter summary judgment in favor of the Trust and Windsor. Alternatively, this Court should reverse and remand for further proceedings before the district court.

Respectfully submitted,

DATED this 10th day of June, 2015

s/ Alexander Dushku

_____

Alexander Dushku
R. Willis Orton
R. Shawn Gunnarson
Shawn T. Richards
KIRTON | MCCONKIE
60 East South Temple, Suite 1800
Salt Lake City, UT  84111
adushku@kmclaw.com
(801) 328-3600

David W. Scofield
PETERS|SCOFIELD
7430 Creek Road, Suite 303
Sandy, Utah 84093
(801)322-2002
dws@psplawyers.com

*Attorneys for Appellants*

June 10, 2015

## STATEMENT ON ORAL ARGUMENT

Pursuant to 10th Circuit Rule 28.2(C)(4), Appellants Windsor Securities, LLC and the Sheldon Hathaway Family Insurance Trust make the following statement of reasons why argument is necessary:

The decisional process would be significantly aided by oral argument because of the unusual interplay between Utah law and a complex factual record. State insurance law is not the ordinary substance of federal adjudication, as the district court's errors of law suggest.  Oral argument is therefore warranted to provide the Court, sitting in diversity, an opportunity to question counsel for the parties regarding the governing principles of Utah law and their application to the record.  In addition, argument would offer an efficient means of isolating those facts and circumstances that are truly dispositive for this appeal.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,484 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

DATED this 25th day of January, 2016

s/ Alexander Dushku
_____
Alexander Dushku
   *Attorney for Appellants*
KIRTON | MCCONKIE
60 East South Temple, Suite 1800
Salt Lake City, UT  84111
adushku@kmclaw.com
(801) 328-3600

## CERTIFICATE OF ECF COMPLIANCE

Pursuant to § II(I) of the 10th Circuit Court of Appeals CM/ECF User's Manual, I hereby certify that:

All required privacy redactions have been made;

The hard copies of the foregoing brief, which are required to be submitted to the clerk's office, are exact copies of the brief filed via ECF; and

The foregoing appendix, submitted via ECF, has been scanned for viruses with Sophos Endpoint Security & Control version 10.3 (updated January 25, 2016) and, according to the program, is free of viruses.

DATED this 25th day of January, 2016.

s/ Alexander Dushku
_____
Alexander Dushku
   *Attorney for Appellants*
KIRTON | MCCONKIE
60 East South Temple, Suite 1800
Salt Lake City, UT  84111
adushku@kmclaw.com
(801) 328-3600

61

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 25, 2016 I electronically filed the foregoing

using the court's CM/ECF system, which will send notification of such filing to the

following:

Jessica L. Wilson
jessica.wilson@emhllp.com

Thomas F.A. Hetherington
tom.hetherington@emhllp.com

Andrew Kasner
andrew.kasner@emhllp.com

Mark Morris
mmorris@swlaw.com


DATED this 25th day of January, 2016


s/ Alexander Dushku
_____
Alexander Dushku
  *Attorney for Appellants*
KIRTON | McCONKIE
60 East South Temple, Suite 1800
Salt Lake City, UT  84111
adushku@kmclaw.com
(801) 328-3600